Felix E. PEREZ, Plaintiff–Appellant,

v.

UNITED STATES, Defendant–Appellee.

No. 97–5103.

United States Court of Appeals,
Federal Circuit.

Oct. 9, 1998.

gaton Division, U.S. Department of the Army, of Arlington, Virginia.

Before RICH, PLAGER, and GAJARSA, Circuit Judges.

PLAGER, Circuit Judge.

This is a military pay case in which Felix E. Perez ("Perez") claims he was wrongfully retired in a rank below that to which he is entitled. In 1981 Perez held a commission in the United States Army Reserves ("Army Reserves"), and was serving on active duty. In 1982, pursuant to legislation eliminating dual-status commissions, and after receiving advice from Department of the Army ("Army") personnel, Perez elected to integrate into the United States Regular Army ("Regular Army"), thereby ending his service in the Army Reserves in which he held the reserve rank of colonel. In 1991 Perez reached mandatory retirement from the Regular Army. On that date, he held the rank of lieutenant colonel and was retired in that rank over his objection. Perez asserted that he should instead be retired as a colonel, based on his holding that reserve rank in 1981. The United States Court of Federal Claims dismissed his complaint pursuant to Rule 12(b)(4) of that court, on the grounds that Perez had failed to state a claim upon which relief can be granted. *See* 37 Fed. Cl. 764. Because the applicable statute does not entitle Perez to be retired in his prior reserve rank and because his estoppel argument must fail, we affirm the judgment of the Court of Federal Claims.

## BACKGROUND

Mark L. Waple, Waple & Associates, of Fayetteville, North Carolina, argued for plaintiff-appellant.

Martin F. Hockey, Jr., Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, and James M. Kinsella, Assistant Director. Of counsel on the brief was Major Douglas K. Mickle, Attorney, Office of the Judge Advocate General, Army Litigation Center, Litigaton Division, U.S. Department of the Army, of Arlington, Virginia.

Starting in 1963, Perez was a commissioned officer in the Army Reserves. He was ordered to active duty on March 11, 1963, in the rank of second lieutenant. He continued on active duty for 28 years, during which time he received regular promotions. He retired on March 31, 1991, with the rank of lieutenant colonel.

From 1963 until 1981, Perez was also given a concurrent but separate reserve (inactive duty) rank, also with regular promotions, as was permitted until September 15, 1981. *See* H.R.Rep. No. 96–1462, at 13 (1980), *reprinted*

*in* 1980 U.S.C.C.A.N. 6333, 6344. These were known as "hip-pocket promotions." *See id.* Prior to September 15, 1981, reserve officers on active duty were able to maintain dual commissions: an "active-duty" commission and a "reserve" commission. Separate promotion selection systems were maintained, enabling a reserve officer to hold different ranks in the two systems. *See id.*

As a result, Perez, during the time he was on active duty, was promoted through the "reserve" ranks. Eventually, in June 1981, he was selected for the reserve rank of colonel. He was promoted to that position on September 30, 1981 and assigned a November 28, 1981 date of rank.

Meantime Congress enacted legislation that affected military officer retirement. On December 12, 1980, Congress enacted the Defense Officer Personnel Management Act ("DOPMA"), Pub.L. No. 96–513, 94 Stat. 2835 (codified as amended in scattered sections of 10 U.S.C.). The elimination of dual-status commissions was one stated purpose of DOPMA. *See* H.R.Rep. No. 96–1462, at 3, 5, 1980 U.S.C.C.A.N. at 6334, 6336. Another provision made more stringent certain requirements for determining the rank of a dual-status officer upon retirement, specifically requiring that the officer have served on active duty in that rank. *See* Pub.L. No. 96–513, title V, § 502(18), and title I, § 112, 94 Stat. at 2910, 2876 (codified as amended at 10 U.S.C. §§ 3961(a), 1370(a) (1994)).

Pursuant to DOPMA, the Army offered dual-status officers such as Perez the choice of integrating into the Regular Army and continuing on active duty or remaining in the Army Reserves and retiring upon completion of 20 years of service. The Army notified Perez to this effect by letter dated June 16, 1981.

Shortly thereafter, on July 10, 1981, before DOPMA went into effect, Congress made several changes to DOPMA by way of the Defense Officer Personnel Management Act Technical Corrections Act ("DOPMATCA" or "Technical Corrections Act"), Pub.L. No. 97–22, 95 Stat. 124 (codified as amended in scattered sections of 10 U.S.C.). Section 634 of the Technical Corrections Act provided a savings provision which enabled dual-status

active-duty Army Reserves officers who retired after the effective date of DOPMA to keep their reserve grade held on September 14, 1981, the day prior to DOPMA and DOPMATCA becoming effective (*see* 10 U.S.C. § 101 note (1994) (Effective Date of 1980 Amendment)), without meeting the more stringent service-in-rank rule imposed by DOPMA.

This case turns on the construction of the savings provision, which states:

> Unless entitled to a higher grade under any other provision of law, a member of the Army or Air Force *who is a reserve officer and who—*
>
> (1) *is on active duty on September 14, 1981;* and
>
> (2) after such date retires under section 3911 or 8911 of title 10, United States Code,
>
> *is entitled to retire in the reserve grade which he held or to which he had been selected for promotion on September 14, 1981.*

DOPMATCA, Pub.L. No. 97–22, § 634, 95 Stat. at 135 (codified at 10 U.S.C. § 611 note (1994) (Savings Provision for Retired Grade of Certain Reserve Officers)) (emphasis added).

The Army's June 16, 1981 letter (sent prior to enactment of DOPMATCA) informed Perez that DOPMA had been enacted and would be implemented on September 15, 1981. The letter further informed Perez that pursuant to DOPMA he was eligible for integration into the Regular Army. The letter explained that if he chose to integrate, he could remain on active duty for 28 years as a Regular Army lieutenant colonel, whereas if he instead remained in the Army Reserves, he would have to retire from active duty upon completion of 20 years of service.

Perez responded by letter dated June 23, 1981. In his letter Perez stated that he was aware of proposed legislation "to 'Grandfather' Reserve Officers on active duty who hold a grade higher than that held on active duty," apparently referring to § 634 of the Technical Corrections Act. Perez explained that he was unable to decide at that time whether to integrate into the Regular Army

because he was uncertain as to whether integration would cause him to forfeit, for retirement purposes, the reserve colonel grade for which he had been selected for promotion. In particular, he inquired as to whether integration would affect his eligibility to retire as a colonel, based on his reserve rank: "In the event I decide to accept integration into the regular Army, am I automatically declining my Reserve's 06 [colonel] grade?"

On July 1, 1981, a Major James T. Cook responded with an official Army postcard, stating in handwriting, "Legislation has passed—your [sic] grandfathered under DOPMA. [Regular Army] integration will not change your retirement status of 06."

Shortly thereafter, the Army issued a formal message, published by letter dated July 10, 1981 (which Perez also received), informing of the savings provision provided by § 634 of the Technical Corrections Act. The July 10 letter set forth the text of § 634 and then attempted to explain its effect on dual-status active-duty officers who held a higher reserve rank than their active-duty rank:

> Therefore, a reserve officer on active duty (as an officer or enlisted member) on 14 September 1981 and who later retires with more than 20 years active service, 10 of which was as a commissioned officer (10 USC 3911), is entitled to retire in the reserve grade he held or to which he had been selected for promotion on 14 September 1981 (even if he had not served in that grade on active duty). It should be noted that if such an individual is promoted to a higher reserve commissioned grade after 15 September 1981, the active duty requirements of 10 USC 1370, as added by DOPMA, apply.

Prior to DOPMA, a reserve officer could retire from active duty in his reserve grade despite having never served in that grade on active duty. *See* H.R.Rep. No. 96–1462, at 13, *reprinted at* 1980 U.S.C.C.A.N. at 6344; H.R.Rep. No. 97–141, at 49 (1981), *reprinted at* 1981 U.S.C.C.A.N. 24, 49. Under DOPMA, to qualify for retirement in a certain grade, an officer must serve in that grade on active duty for a minimum period of time: three years for voluntary retirement, and six months for involuntary retirement. Pub.L.

No. 96–513, title V, § 502(18), and title I, § 112, 94 Stat. at 2910, 2876. The July 10 letter advised dual-status officers that, because of enactment of DOPMATCA with its savings provision in § 634, there was no need to retire prior to DOPMA going into effect to avoid DOPMA's more stringent service requirements.

After receiving the July 1 postcard and the July 10 letter, Perez elected to integrate and was given a commission in the Regular Army on January 25, 1982. Eight years later, in April 1990, the Army notified Perez by letter that he was approaching his mandatory retirement date pursuant to 10 U.S.C. § 633 (1994), based on his 28 years in active service. The letter advised him that he would be retired in the grade of lieutenant colonel. Perez responded with a return letter stating that he was entitled to retire as a colonel. He included as supporting documentation the July 1 postcard he had received from Major Cook.

At the Army's request, the Office of the Judge Advocate General ("JAG") reviewed Perez's case and concluded that, under DOPMA and DOPMATCA, Perez could not be retired in an Army Reserves rank because he no longer held an Army Reserves commission. After receiving this opinion, Perez applied to the Army Board for Correction of Military Records ("ABCMR"), requesting that he be retired in the rank of colonel. After investigation of the matter, the ABCMR denied Perez's request.

Accordingly, Perez was retired from the Regular Army in the rank of lieutenant colonel on March 31, 1991. Thereafter, on November 5, 1993, he filed suit in the Court of Federal Claims, seeking correction of his military records to reflect retirement in the grade of colonel and back pay and allowances since the date of his retirement. The Government filed a motion to dismiss the complaint for failure to state a claim upon which relief can be granted, pursuant to Rule 12(b)(4) of the Court of Federal Claims.

In opposition, Perez pointed out that, though he was not an Army Reserves officer at the time of his retirement, he was an Army Reserves officer on active duty on

September 14, 1981. Consequently, he argued, under the proper construction of § 634 of DOPMATCA, he is entitled to be retired as a colonel, the reserve grade to which he had been selected for promotion prior to September 14, 1981. He also pointed out that before accepting Regular Army integration, he was counseled by the Army (by way of Major Cook's July 1 postcard) that such integration would not affect his retirement in the grade of colonel. He argued that the Government is thereby estopped from denying him retirement as a colonel.

The Government, on the other hand, asserted that Perez's construction of § 634 is incorrect. It argued that § 634, properly construed, only applies to those officers who are reserve officers at the time of retirement. The Government explained that Perez voluntarily chose to integrate into the Regular Army and thereby forfeited his Army Reserves grade. According to the Government, because Perez was not an Army Reserves officer at the time of his retirement, § 634 is not applicable and the applicable statutory law requires that he be retired as a lieutenant colonel. With regard to Perez's estoppel assertion, the Government argued that it cannot be estopped from correctly applying the statutory law, even when its agent provided erroneous information upon which Perez apparently relied to his detriment.

The Court of Federal Claims agreed with the Government and granted its motion to dismiss. *See* 37 Fed. Cl. at 768–71. On appeal, the parties raise the same arguments.

## DISCUSSION

■ A motion to dismiss under Rule 12(b)(4) for failure to state a claim upon which relief can be granted is appropriate when the facts asserted by the claimant do not under the law entitle him to a remedy. *See New Valley Corp. v. United States,* 119 F.3d 1576, 1579 (Fed.Cir.1997). Whether the complaint was properly dismissed under Rule 12(b)(4) is a question of law, which we review independently. *See id.* at 1580. In reviewing the dismissal under Rule 12(b)(4), we are mindful that we must assume all well-pled factual allegations as true and make all reasonable inferences in favor of Perez, the non-

movant. *See Highland Falls–Fort Montgomery Cent. Sch. Dist. v. United States,* 48 F.3d 1166, 1169–70 (Fed.Cir.1995). However, in this case, the facts and factual inferences are not in dispute. Rather, resolution of the case hinges on pure legal questions. Hence, if the law requires that those questions be answered in the Government's favor, dismissal pursuant to Rule 12(b)(4) was appropriate.

### A.

■ Perez's claim that § 634 of the Technical Corrections Act entitles him to be retired as a colonel turns on whether § 634, properly interpreted, requires that one be a reserve officer on the date of retirement. Thus, our first task is to construe § 634. We begin, as we must, with the language of the statute itself. If that language is unambiguous, it controls. *See Muwwakkil v. Office of Personnel Management,* 18 F.3d 921, 924 (Fed.Cir.1994) ("When statutory interpretation is at issue, the plain and unambiguous meaning of a statute prevails."); *West Virginia Univ. Hosp., Inc. v. Casey,* 499 U.S. 83, 98–99, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991). This is often referred to as the "plain meaning" rule. Here, the text of § 634 does not expressly answer the question before us. It states "a member of the Army or Air Force *who is a reserve officer,*" without explicitly stating the date on which the member must be a reserve officer to qualify under the savings provision.

The House Report accompanying DOPMATCA explains that the purpose of § 634 was to preserve the ability of certain reserve officers to retire in their reserve grade despite not meeting DOPMA's minimum active-duty service requirements in that grade. *See* H.R.Rep. No. 97–141, at 6, 25–26, *reprinted at* 1981 U.S.C.C.A.N. at 29, 48–49. Perez argues that the applicability of § 634 does not turn on whether the reserve officer elected to integrate into the Regular Army. Rather, Perez asserts, § 634 applies to individuals who were reserve officers on September 14, 1981 and who were on active duty on that date, regardless of whether the individual was no longer a reserve officer on his date of

retirement due to having elected to integrate into the Regular Army.

In contrast, the Government asserts that § 634 only applies to those reserve officers who elected not to integrate into the Regular Army, but instead remained in the Army Reserves. The Government explains that § 634 was enacted to preserve, for such reserve officers, the right to retire in the reserve grade they held on September 14, 1981, provided they were on active duty on that date. Without § 634, the Government explains, such reserve officers would not be able to retire in that reserve grade after the effective date of DOPMA unless they met the three-year or six-month active-duty in-rank service requirements newly created by DOPMA.

The construction of § 634 advocated by the Government is more consistent with the purposes of DOPMA and DOPMATCA. The Government's construction furthers DOPMA's purpose of eliminating dual-status commissions by preventing a dual-status reserve officer from retiring in a reserve grade after integrating into the Regular Army. In contrast, the construction advocated by Perez prolongs dual-status commissions by allowing such officers to retire in their former reserve grade despite having been integrated into the Regular Army and holding a Regular Army commission. The Government's construction also recognizes DOPMATCA's purpose of allowing certain reserve officers to retire in their reserve grade despite not meeting DOPMA's minimum active-duty service requirements in that grade: reserve officers situated as Perez was, but who chose not to integrate into the Regular Army, would be allowed to retire in their reserve grade held on September 14, 1981.

The verbal structure of § 634 also supports the Government's construction. In essence, Perez construes the "who is a reserve officer" clause of § 634 as if it reads "who is a reserve officer [on September 14, 1981]," whereas the Government construes the clause as reading "who is a reserve officer [on his date of retirement]." The overall structure of § 634 and the way the notions of past and present are treated lends significant support to the Government's view.

In two places in § 634 Congress explicitly referred to past events by specifying a past date: "who (1) is on active duty on September 14, 1981"; and "the reserve grade which he held or to which he had been selected for promotion on September 14, 1981." This strongly suggests that in other places in § 634 where the verb "is" appears without a specified date Congress intended the present tense, namely, the date on which the statute is applied—the date of retirement. This statutory structure indicates that Congress intended the unmodified occurrences of the verb "is" in § 634 to be construed as referring to the date of retirement: "a member ... who is a reserve officer [on his date of retirement] ... is entitled to retire [on his date of retirement] in the reserve grade which he held ... on September 14, 1981."

Further support for this reading is found in the legislative history to § 634. With regard to § 634, the House Report accompanying DOPMATCA states in part:

> Section 634 is a savings provision that authorizes a member on active duty on September 14, 1981, to voluntarily retire in the reserve grade that such member held or to which the member was selected for promotion on that date. It would not be necessary for the member to be serving on active duty in such grade or in any commissioned grade on that date; only that the member be serving on active duty on that date.... Under this new section the right to voluntary retirement in the *reserve commissioned grade held on the date of retirement* is preserved for these active duty members. However, this authority does not apply if the member *is subsequently promoted to a reserve commissioned grade higher than that described above.*

See H.R.Rep. No. 97–141, at 25–26, *reprinted at* 1981 U.S.C.C.A.N. at 48–49 (emphasis added). The emphasized text necessarily refers to members that maintained their reserve commission after September 14, 1981, until their date of retirement. That was possible only for those members who elected not to integrate into the Regular Army, because upon integration, a member lost his reserve commission. As such, this indicates

that Congress intended § 634 to apply only to those who remained in the Army Reserves until retirement.

Finally, in addition to giving weight to the Army's current interpretation of § 634, we note that the Army's July 10, 1981 letter expressed the same interpretation. The letter contains the statement:

> Therefore, *a reserve officer* on active duty (as an officer or enlisted member) on 14 September 1981 and *who later retires* with more than 20 years active service, 10 of which was as a commissioned officer (10 USC 3911), is entitled to retire in the reserve grade he held or to which he had been selected for promotion on 14 September 1981 (even if he had not served in that grade on active duty). *It should be noted that if such an individual is promoted to a higher reserve commissioned grade after 15 September 1981, the active duty requirements of 10 USC 1370, as added by DOPMA, apply.*

(Emphasis added.) The first sentence refers to "a reserve officer ... who later retires...." This suggests that for § 634 to apply, the individual must retire from the Army Reserves, which is possible only if the individual did not elect to integrate into the Regular Army. Furthermore, the second sentence similarly contemplates that § 634 is applicable to those reserve officers who remained in the Army Reserves, as only those individuals could obtain further promotions in their reserve grade. Thus, the July 10 letter, which set forth the Army's formal interpretation of § 634 in 1981, supports the Army's current interpretation.

After considering these various interpretive aids, we are forced to the inescapable conclusion that § 634 can only apply to those members who are Army Reserves officers on the date of their retirement. Because Perez was not an Army Reserves officer upon his retirement on March 31, 1991—having integrated into the Regular Army in 1982— § 634 is not applicable.

**B.**

■ Next we address Perez's estoppel argument. Perez argues that even if we determine—as we have—that § 634 must be construed as requiring the individual to be a reserve officer on the date of retirement, the Government should be estopped from applying that construction in this case because of the erroneous advice he received.

Early on in the presentation of this argument, Perez acknowledges that the U.S. Supreme Court's opinion in *Office of Personnel Management v. Richmond,* 496 U.S. 414, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990), presents a major obstacle. In *Richmond,* the claimant relied upon erroneous advice given to him regarding the statutorily-determined maximum amount of outside income that he could receive without jeopardizing his government disability annuity. Consequently, he exceeded this statutory cap and unwittingly forfeited his annuity payments. He then claimed, as Perez does here, that the Government should be estopped from finding him ineligible. This court agreed.

However, the Supreme Court disagreed. *Richmond,* 496 U.S. at 434, 110 S.Ct. 2465. The Court held that the Appropriations Clause of the U.S. Constitution[1] precludes the judiciary and executive branches from applying estoppel against the Government when a claimant is seeking public funds. *Id.* at 424–26, 110 S.Ct. 2465. The Court explained that this is because the Appropriations Clause prohibits a monetary award not authorized by the legislative branch. *Id.*

Nonetheless, Perez attempts to distinguish *Richmond.* He explains that in *Richmond* the advice relied upon was given by a federal employee who was not part of the organization directly responsible for the claimant's retirement benefits (*i.e.,* the Office of Personnel Management), but was instead an employee relations specialist with the Navy. In contrast, Perez explains, Major Cook, who advised Perez that he was "grandfathered," was with the very agency responsible for Army promotions and retirements (*i.e.,* the United States Army Military Personnel Cen-

---

1. The Appropriations Clause of the Constitution, Art. I, § 9, cl. 7, provides, "No money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."

ter). Perez argues that because of this distinction, and because the *Richmond* Court chose not to announce a "sweeping rule" that estoppel could never lie against the Government, his estoppel claim is not barred by the *Richmond* decision.

Perez is incorrect. The *Richmond* Court did adopt a "sweeping rule" with respect to one type of suit against the Government, namely, those in which the claimant seeks payment of money from the Public Treasury contrary to a statutory appropriation. *Id.* at 423–24, 110 S.Ct. 2465. With respect to such suits, the Court announced that there can be no estoppel. *Id.* at 423–24, 434, 110 S.Ct. 2465. In fact, the Court was presented with the exact issue presented here and unequivocally announced the no estoppel rule:

> This case presents the question whether erroneous oral and written advice given by a Government employee to a benefits claimant may give rise to estoppel against the Government and so entitle the claimant to a monetary payment not otherwise permitted by law. We hold that payments of money from the Federal Treasury are limited to those authorized by statute, and we reverse the contrary holding of the Court of Appeals.

*Id.* at 415–16, 110 S.Ct. 2465. What the *Richmond* Court left for another day is whether estoppel can lie against the Government in a case not involving payment from the Treasury, *i.e.,* claims for other than monetary relief. *Id.* at 423–24, 434, 110 S.Ct. 2465.

In determining that there could be no estoppel with regard to monetary claims such as Perez's here, the Court explained that the Appropriations Clause of the Constitution allows a payment of money from the Federal Treasury "only through an appropriation made by law; in other words, the payment of money from the Treasury must be authorized by a statute." *Id.* at 424, 110 S.Ct. 2465. Thus, "no money can be paid out of the Treasury unless it has been appropriated by an act of Congress." *Id.* (citation omitted). The Court pointed out that only Congress has the power to provide a recovery for those such as Perez who rely on mistaken advice. *Id.* at 428, 110 S.Ct. 2465. The Court noted that Congress can provide relief, should it choose to do so, by special legislation. *See id.* at 428–29, 110 S.Ct. 2465. This court, however, is without power to provide such relief because the Constitution assigns the authority to appropriate public funds to Congress alone, except to the extent that Congress has delegated such authority. *Id.* at 431, 110 S.Ct. 2465.

Having concluded that there can be no estoppel in this case, we are not obligated to address the equities of Perez's case. However, we note that we do sympathize with Perez and consider it very unfortunate that he received erroneous advice from Major Cook. We also note, without diminishing our sympathy, that Perez received significant benefits by integrating into the Regular Army in 1982. The Army's June 16, 1981 letter, which extended Perez the offer to integrate, explained these benefits. The letter explained that as a member of the Regular Army, the chance of losing his commission through a reduction-in-force would be substantially less than it would if he remained in the Army Reserves.

The letter also explained that if he chose not to integrate, he would have to retire after 20 years of active-duty service, whereas if he integrated, he, as a lieutenant colonel, could remain in service for 28 years. While the Army undoubtedly benefited from Perez's eight additional years of service, Perez also benefited. In this regard, the Government explains (unrebutted by Perez) that by serving eight more years, Perez is receiving greater retirement payments as a lieutenant colonel with 28 years of service than he would have received as a colonel with 20 years of service. Furthermore, allowing Perez to retire as a colonel with 28 years of service based on his reserve grade would be inconsistent with the Army's 20 year limit on reserve officers.

## CONCLUSION

Because controlling law dictates that his claim must fail, the Court of Federal Claims was correct in dismissing his complaint, and we must affirm.

*AFFIRMED.*

### COSTS

Each party shall bear its own costs.